The second case in which we'll hear oral argument this morning is number 05-1500, Freedom New York v. Department of Defense During the 19 years since the Defense Logistics Agency repeatedly breached Freedom's MRE-5 contract and wrongfully terminated that contract by default, the United States apparently has resolved that the best defense is perhaps a strong offense because they've consistently attempted to characterize Freedom as simply an underperforming contractor rather than admit that the government forced Freedom out of business. When we were able to pierce through that characterization at trial and the board decision that resulted in 2001, the board's findings of fact that actually identified and pursued the record came out with findings that came out to the contrary, that in fact, Freedom was blameless with respect to any of the contract deficiencies, and in fact, it was the government that had violated and breached the contract. But that's not the issue now. The issue is whether on the remanded issues that they considered in connection with mod 25, whether their decision is supported by substantial evidence. Yes, Your Honor. Yes, Your Honor. And I'm here to focus on three of those issues. I'm pointing out that by way of background only because I think for purposes of this court what we need to do on each of these three issues is the same as the board did in 2001, which is pierce through the characterization and focus on the facts. And I believe that when we do that, indeed, this court will determine that mod 25 is unenforceable. There are three areas that I'd like to, three issues with respect to which I'd like to highlight a couple of the facts in the brief and perhaps supplement the record. One is with respect to fraud and the inducement. The second is with respect to the lack of consideration argument. And the final one has to do with the request for this board, this court to reconsider its previous decision on the basis of manifest injustice. Let me ask you this, Mr. Luchansky, if somebody stepped into the room and said you could only have one of those arguments, you had to, I know this is the kind of question that lawyers often don't like, but say you had to just rest on one of those arguments, which one would you go with? In other words, I'm asking you to start off with what you view as the strongest of those contentions and I realize that when you select that one in response to my question, you're not abandoning in any way the others, but what do you view as the strongest of those three arguments? Your Honor, and you'll forgive me for answering the following way, I think with respect to likelihood of success, I think fraud and the inducement is the strongest argument. Well, that's fine, go. But nevertheless, the reason I want to qualify that is I think with respect to the underlying facts, really the manifest injustice argument is the strongest one. I just put it second because of the burden that I know comes with asking this Court to reconsider and change one of its prior decisions. Why do you think fraud and the, now tell us why you think fraud and the inducement is your strongest argument? With respect to that argument, Your Honor, fraud and the inducement, the facts show that the discussion between Freedom and its representatives and the government in that period of time was a crucial and material component to the Mod 25 signing. You're talking about the V-Loan Guarantee issue now? That's right. That's what you're really pointing in on? Yes, Your Honor. I'm sorry if I wasn't clear about that. Oh, no, no. I just wanted to confirm my understanding. But that's correct, the V-Loan Guarantee, because at that point, everyone, Freedom's representatives and the government's representatives, acknowledged on the record, both from Freedom and the government and DNFs and determinations and findings, acknowledged that Freedom could not complete the contract at that point without an infusion of $2.7 million of capital. Okay. So my understanding is the Board decision doesn't rest on the notion that the V-Loan was unimportant, but you and the Board seem to be addressing different theories of fraud here. I mean, as I understand it, you're saying there was fraud because the government negotiators knew that there had to be an appropriation to get the V-Loan, and the Board treated the alleged fraud as being whether the government negotiators were aware that the V-Loan program was going to be shut down. I mean, that's the basic problem here, is that you seem to be talking about a different fraud than the Board addressed. And the question I have is, is there any evidence in the record that the V-Loan was denied because the appropriation wasn't available? I don't think there's evidence that the V-Loan was denied. What happened was that over the course of those months, after the application and after Mod 25, and then Mr. Gervaisman informed Freedom that, while there was no appropriation, and that being the first time that Freedom understood that that was a prerequisite to having the loan approved, Freedom went and tried to get an appropriation. But there was never any denial because, without the appropriation, it couldn't be approved. Well, but maybe I used the wrong word when I said it, that it wasn't processed because there was no appropriation. Yes, Your Honor. Is there testimony to that effect? Well, I believe there certainly was testimony by Mr. Thomas and by Mr. Gross. Mr. Gross was the lender that the application that they submitted was never approved. There's certainly testimony. I don't have the site right now, but they certainly testified to that. And essentially, the record shows that it went up to Congress. The last the record shows is the application went up to Congress for consideration and there was never any further movement on it, and therefore it never was approved. Does that have the appropriation process work, that the paperwork for specific loans went up to Congress? That's my understanding, Your Honor. I really don't know myself the way the V-Loan process usually works. I only know it in the context of this case, and that's my understanding based on the record. And was the loan here sent to Congress, was the loan? The record reflects that it was, but that either it, I don't know if it was denied or just died in Congress, but there was never approval of it after it was sent on to Congress. That's my understanding of the record. Where do we find the testimony about it being sent on to Congress? There is, I would have to find the site. There is actually a, in the record, there's actually a copy of the document from Congress indicating that this approval of the request for a V-Loan has been submitted to Congress. So that's in the FT exhibits. I don't have the specific exhibit at hand, but I would be happy to find it. Where is the fraud if this was the way things happened? They did process your loan, I guess, and it went up to Congress, and then there just wasn't an appropriation. Well, it wasn't, but it didn't go that way. My understanding is, and this comes from the dry mix cases, what we found out later, what Freedom found out after it signed Mod 25 was in fact the V-Loan process isn't supposed to work this way. The V-Loan process is, the V-Loan guarantee can only even be offered if there's free appropriation of the funds that are then to be applied for. That's something Mr. Kobiasman knew because he was involved in those cases that were decided in 1984, where he duped Dry Mix at the time and their lender into applying for a V-Loan. And then said, oops, you need to be pre-approved. So he knew that when he told Freedom and Randy Gross of Bankers Leasing, okay, we'll give you a V-Loan for the 2.7 million, he didn't tell Freedom. He didn't say he'd give you a V-Loan, he said he would- We'll process a V-Loan, but he knew that they couldn't even process a V-Loan. A V-Loan can't be processed unless there were an appropriation. Now, the fact that it went up to Congress afterwards, perhaps the reason it died is because that's not the way a V-Loan is to be done. But we don't know. Well, the case is, but we do know, that's what the case of the Dry Mix case has established. Mr. Gaviseman was the one who established it in the Dry Mix cases that the proper procedure, and it's all laid out there in the appendix attached to our brief. Those cases establish in clear detail the way to process a V-Loan. The only way it can be processed is if there's a pre-appropriation of funds. That's set forth in those cases that Mr. Gaviseman established. That's the only piece of information that the board was missing, and the board, in its decision from which we're appealing, said that there's no evidence that Mr. Gaviseman knew prior to the negotiations with Freedom over the V-Loan. That the program had been shut down. Now, the shutdown terminology- Is there testimony in this record that there was no processing of this loan because there hadn't been a pre-appropriation? With respect to, the answer to that question is no. Because at the time, Freedom didn't understand that it was the pre-appropriation issue that was at stake. At what time? Pardon me? At what time? At the time that the record was, at the time the record was established. What Freedom had been told back in- The record in this case, before the board. Yes. What Freedom had been told in 86, during the negotiations over Mod 25, the reason the processing ended, Gaviseman- Yeah, but what prevented Freedom from making a record on this point, that the loan wasn't processed because of the lack of a pre-appropriation? What prevented Freedom from making that record at the time of the hearing? Well, what Freedom understood at the time was that the program had been shut down. That's what they had been told. It turns out that that's not the case. But that was the understanding that Freedom had. That's what they were told in 86, we can't process loan, the program had been shut down. And that's the understanding Freedom took into this case. It was only after that point, that with the discovery of these cases, the dry mix cases that Mr. Gaviseman was involved in, after the trial, that there was a realization that that's not the way the process worked at all. When did you discover those cases? That was in the context of this appeal. So those cases were not argued to the board in this proceeding? No, Your Honor. Mr. Cianci, let me just ask you, because I realize you've gone in. We'll restore your rebuttal time, because you've had questioning from all of the members of the panel. At page eight, it seems to me the critical finding on this issue, or the critical point in the board's decision, is at page A8, the paragraph at the bottom that starts, the record contains no evidence. And that seems to be the finding that you need to overcome in order to have us rule in your favor, okay? Yes, Your Honor. You agree on that? Yes, Your Honor. To what do you point in the record to show that this finding by the board here, at the bottom of eight, is incorrect? I mean, that seems to me the critical point. What can you cite us to in the record that will, in your view, convince us that that finding is wrong, and thus tip the scales in your favor? Yes, Your Honor, I think with respect to the record that excludes the dry mix cases that we've now submitted in connection with this appeal, I think that the only evidence there is inferential. There is nothing that I can point this board to. I can say, aha, you see Mr. Gabaisman knew in March or April that a pre-appropriation was necessary, and he didn't tell us. The inference, of course, is that he's the one who negotiated the V loan with us. He's the one who understood how it worked, and yet never revealed to us that it couldn't be processed or the program was shut down, which we now understand means pre-appropriation. It's really on the dry mix cases that I've now attached that are the aha moment. Would it be fair to say then, based on the discovery of these dry mix cases, that you've changed your theory of fraud from the theory that was presented to the board, and that you're now presenting on appeal? I don't think so, Your Honor. I think that perhaps, at most, it's a question of characterization. Certainly, the way we presented it to the board wasn't using the phrase shut down, that we didn't know that the program- The pre-appropriation argument wasn't made to the board. Using the term pre-appropriation, that's correct. But what we understand now is that the shutdown of the program for our purposes was pre-appropriation, that it was shut down to us. This was the characterization that Mr. Gabaisman used with us, not one that we invented. But what we understand is that by presenting that argument to the board, the clarification of it is that it required pre-appropriation, and there was no pre-appropriation. Mr. Lushansky, you're well into your rebuttal, but we will, since you had questions, we will restore your entitlement rebuttal. So, Ms. Boren, if you could give Mr. Lushansky his full five minutes when he comes back on rebuttal. Thank you, Your Honor. Thank you.  Mr. Pease? May it please the court. The decision of the Armed Services Board of Contract Appeals should be affirmed because the board correctly found the modification 25 to be valid. And the decision is supported by substantial evidence. Your Honors, the government did not fraudulently induce Freedom New York to sign mod 25. Is Mr. Lushansky right that the loan was submitted to Congress for approval? Your Honor, I'm not familiar with that, the lack of citation that he gave. I'm not certain that it was submitted to Congress or not. However, the record shows clearly that Mr. Francois, a representative of Freedom New York, after the side agreement was considered and the modification 25 was signed, Mr. Francois, Freedom's representative, went to Congress or stated that he was in the process of going to Congress to obtain an appropriation for this V loan. Or for the ability to obtain a V loan. So it's clear from the record that the availability of a V loan was not simply based upon a prior appropriation in a prior year. That in fact, Ms. Freedom's knowledgeable representative, Mr. Francois, understood that appropriation could be obtained afterwards and still could obtain a loan guarantee. As Your Honors have pointed out, the only, the most agreement that existed, or the most commitment from the government was to process a V loan application. It was not to- It's a V loan guarantee application, isn't it really? I mean, as I understand- Yes, Your Honor, a V loan guarantee application. But nonetheless, it's processing the application to obtain a V loan guarantee. The way that Freedom represents this- In other words, what happens is DLA would provide a guarantee to a private lending institution, is that correct? Your Honor- In other words, there was a bank, I don't recall the name of it, but in the record there's reference to a private banking institution or private lending institution. And presumably, that institution would lend the money to Freedom and that loan in turn would be guaranteed by DLA, is that correct? Essentially, Your Honor, I believe that the process involved both the DLA and the Federal Reserve. That's what I wanted to ask you, what was the role of the Federal Reserve? Because I understood DLA as providing the guarantee, and you're certainly correct that the Federal Reserve was involved in the process here. What was the role of the Federal Reserve in the program? Your Honor, my understanding of the role of the Federal Reserve is that the DLA itself, and forgive me, I may not be 100% correct on this. But I believe the DLA itself was the, in effect, sponsor of this loan application. So what the DLA's purpose was, was to tell the Federal Reserve, yes, this is a contractor who should be considered for this. I believe that the guarantee itself came from, I believe the Federal Reserve was the actual grantor of the guarantee. Okay, so the Federal Reserve is the guarantor if there is a guarantee, but it only acts and provides a guarantee if it's had a sponsor come forward, in this case DLA. That's my understanding of the record, Your Honor, yes. Again, I'm not an expert on the process, but that's my understanding. Let me ask you, please, Mr. Pease, we were discussing with Mr. Leshansky the finding at the bottom of page eight of the board's, I guess it's the remand decision, and he, I think, correctly agreed that this is the critical finding here on this fraud and the inducement issue. What evidence, what is the substantial evidence, in your view, what is the substantial evidence in the record that supports this finding? Because, as you know, we are bound to affirm as long as there's substantial evidence. So you should be in a position to say, okay, here's the substantial evidence that supports the statement at the bottom of page eight. Yes, Your Honor. What is it in your view? And the substantial evidence is, in fact, recited in, further up on page eight in finding 154. The board discusses both that the foregoing testimony that's quoted from the transcript of Mr. Lambert is that that testimony itself does not provide, does not prove that Mr. Kviseman or Mr. Kiesa knew or had any reason to know that the defense department had shut down the V loans. Well, Mr. Lambert was, he had represented freedom, right? Yes, Your Honor. Did Mr. Kviseman or Mr., is it Chiesa or Kiesa, how do you pronounce that? Kiesa, I believe. Okay. Did either Mr. Kviseman or Mr. Kiesa testify on this issue? I don't recall, Your Honor, whether they testified or not. Mr. Bankoff testified and I don't recall whether Mr. Kviseman. I'm sorry, Mr. who testified? Mr. Bankoff, the procuring contracting officer. But you don't recall if either Kviseman or Kiesa testified? I don't recall if they testified in particular, Your Honor. Was this whole pre-appropriation approval issue that is now raised on the bill, was that discussed at all before the board? I don't have a citation, Your Honor, but yes, I believe that that was, it was discussed in the context of the entire context of whether the violin would be approved or not, and in the shutdown. I don't recall if the appropriation itself, and it appears that Freedom here argues that the appropriation itself was at issue, but before the board, it's clear that Mr. Francois, that the issue of appropriation was brought up. Because Mr. Francois discussed in his testimony the appropriation being sought from Congress. Well, there seemed to be possibly two separate theories here. One, that there was a failure to disclose that the program had been shut down, and the board found that there was no proof that the government negotiators knew about that. That's my understanding. Correct. The other theory seems to be that the loan could not have been secured unless there'd been a pre-appropriation, and that that wasn't disclosed by the government negotiators. Was that second issue addressed in testimony? The only testimony that I found to that regard was the testimony of Mr. Francois, and sort of the occurrences after the fact that Mr. Francois did approach and go forward with this appropriations process. So to the extent that there was nothing raised by any of the testimony that that was in any way a problem, it was only raised in the brief that the appropriation itself was somehow precluded a v-loan from happening. So there was no testimony that there was a pre-appropriation requirement and that that wasn't communicated? I don't believe so, Your Honor. I didn't find any testimony to that effect. But the opposite testimony, that the appropriation was pursued by Mr. Francois, is in the record. And that indicates that, based upon that, that the appropriation was not an issue, that the fact that there wasn't a pre-appropriation in this case wasn't in any way precluding a v-loan application from being processed, in the sense that appropriation could still be sought, and in fact was sought. And although an appropriation wasn't approved or the v-loan process was, quote, shut down, it wasn't actually accepted, is a different issue from whether the program was in place in the sense of, was Congress able to appropriate money for it? As the board found, I believe it was until September of, I forget the exact year, but it was later than 1986, the appropriation, the ability to appropriate money for the program was still in place by Congress. So that wasn't an issue, and isn't an issue in this case, although Freedom attempts to make an issue of it. Your Honors, as to the other arguments that were raised in its brief, the issue of consideration, clearly the board's findings in this regard are supported by substantial evidence. The arguments by Freedom that the 114,000 cases of MRE were not, were in fact already part of the contract are clearly wrong. At the time of the signing of modification 25, those cases were not in the contract. They were only able to be reinstated at the option of the government, the discretion of the government. Freedom's assertion that during early negotiations or discussions regarding that, that they objected to that language is not of any importance because Freedom agreed to that language, that they in fact was at the discretion of the government. In addition, the other elements of consideration found by the board, such as the $19,000 additional payment, the payment at 100% reimbursement, was also consideration for the modification 25. In addition, the issue of duress, the issue of duress wasn't raised immediately, and it wasn't raised for over eight months, indicates clearly that there was no duress. The contract itself, the modification, stated there was no duress or coercion. And in fact, Mr. Lambert, Freedom's attorney, stated at the time that based on modification itself, the document of modification 25, that Freedom would be able to complete the contract. Finally, Your Honors, the law of the case doctrine clearly precludes this court from re-addressing prior issues that were decided by the court in a precedential opinion. And Freedom New York had the opportunity, both here and at the board level, to raise all of the arguments that they've now attempted to re-raise. For these reasons and the reasons stated in our brief, Your Honors, we respectfully request that the court affirm the decision of the board. Thank you, Mr. Pease. Mr. Lushansky? As I said, you'll have your full five minutes of your rebuttal if you need it. If I may, Your Honor, beginning with the last issue of the Manifest Injustice, addressing that situation on the facts, and then proceeding after that if I have time to briefly address consideration. With respect to this board's decision, this, I'm sorry, this court's decision that, in fact, the, on integration, that mod 25 was integrated and the two documents whether they were attached, not attached, really didn't matter. Henry Thomas is the one who attached the side letter, and therefore, under the restatement, that is of no moment for this court. I respectfully suggest that that's error, because if we examine the facts of what happened here, at this meeting, at the mod 25 meeting on May 29th, 1986, as everyone correctly points out, Mr. Thomas came in. He had his copy of mod 25 and this May 29th letter, and they were attached. He attached the two. Mr. Bankoff pulled out his May 13th version of the same letter and said, this is the one that I'm familiar with. I want to use that. Fine. He gave it to Mr. Thomas. Mr. Thomas substituted out the letters, and he attached the two. So, so far, I agree with the court's findings that Mr. Thomas is the one who attached those two documents. But the undisputed findings of fact from that point are that Mr. Bankoff then proceeded to say, I need to get approval for this side agreement. I'm going to go fax it to Mr. Chiesa. And he went into the back, and the record, Joint Appendix 852, I'm sorry, Your Honor. Joint Appendix 854 shows the fax cover sheet. What Mr. Bankoff did was separate the two documents, fax only the three-page letter to Mr. Chiesa, and then after he faxed it to him, Mr. Bankoff returned to the room, reattached the two documents, and signed mod 25. So to the extent that this court ruled that, well, we cannot credit the attachment of the two documents because Mr. Thomas is the one who attached the two documents before signing, even though that's a statute of fraud section of the restatement, and I'll leave that to the court to address in its deliberations. But in fact, it was Mr. Bankoff who, before signing the two documents, accepted the two documents. He separated them, reattached them, and signed mod 25. There's no dispute about that. Under those circumstances, even though this court is reluctant to consider extrinsic evidence, there's no question that the board below did consider it. There's no question that the government, in its brief, considered these circumstances. And under these circumstances, it's manifest injustice not to recognize that, in fact, it was the government that was acceding to the attachment of these two documents. It's undisputed that Mr. Thomas said he wouldn't have signed them if he wouldn't have agreed to mod 25, but for the attachment of those two documents. With this court included in its prior decision, testimony from Mr. Bankoff saying, I told him at the time there is no side agreement, no side agreement. That testimony, I found puzzling that the court would include that in its decision. That testimony was expressly rejected by the board, finding Mr. Bankoff specifically on that point to be incredible as a witness. For this court to then include that testimony, to me suggests overturning a finding of fact. That's a finding of fact, but without the accompanying findings and analysis that says there wasn't substantial evidence for the board to come to that conclusion. So without crediting Mr. Bankoff's testimony, as the board rejected, the facts demonstrate that, in fact, it was Mr. Bankoff who attached the two documents and signed off on the attached document without a word. Under those circumstances, Your Honor, I just find it unsupported in the facts or law to conclude, as this court previously did, that integration prevents the consideration of the cover letter, side agreement, whatever we refer to it as, as part of Mod 25. With respect to consideration, Your Honor, the only thing that I would add to what we have in the brief is that what the board found was that the reinstatement of the 114,000 cases didn't constitute consideration for Mod 25 because even if the termination of those cases It did constitute consideration. I'm sorry. It did constitute consideration, even if they said that's because, even if the Well, they said if it was converted to a termination for convenience, all you would get were your costs. Correct. And what I'd like to point out to the court to clarify that is, I see my time is up. May I finish my point, Your Honor? Finish your point, yeah. Thank you, Your Honor. In DNF, in the termination findings that Mr. Bankoff wrote, and which is found at Joint Appendix 271 through 274, at page 273, after the meeting about reinstating the 114,000 cases, Mr. Bankoff stated that the government stated to Freedom that pending additional consideration and final approval, the government would terminate the default 114,000 cases, revise the delivery schedule to that shown above, which includes the reinstatement of the cases, use positive wording, ray the reinsertion quantity, and review the progress payment ceiling. In other words, the government had promised Freedom in its meetings, yes, we will reinstate, with respect to the fact that when Mod 20 showed up and had the sole discretion language, there is evidence in the record that says, Mr. Bankoff told Marvin Liebman, the ACO, the PCO told the ACO, don't release any progress payments until they sign the mod, and that's FT 219. Thank you, Mr. Leshansky. Thank you, Your Honor.